IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                   No. 2:23-CR-0858 RB

SAUL CASTORENA,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

In January 2023, United States Border Patrol agents apprehended several individuals who escaped from a "stash house" where they had been hidden after they illegally crossed the United States/Mexico border. The individuals informed the agents that armed people at the stash house had threatened them and that other immigrants (including children) were still being held at the stash house. The individuals led agents to the neighborhood and pointed out the stash house, which consisted of two residences that, while not physically connected, appeared to have no gap between them. Agents obtained and executed a search warrant.

Defendant Saul Castorena now moves to suppress all evidence obtained as a result of the warrant and argues that the warrant was legally deficient, as one of the two addresses for the residences listed on the warrant was incorrect. Having considered the arguments of the parties and the testimony adduced at the May 9, 2024 evidentiary hearing, the Court will **DENY** Castorena's motion. (Doc. 116.)

**I.    Factual Background**[1]

On January 18, 2023, United States Border Patrol agents apprehended four individuals in

---

[1] The facts as recited in this section come from the Complaint, the Amended Search Warrant, and from testimony offered at the motion hearing. (Docs. 1; 180.)

El Paso, Texas near a Top Golf. (*See* Doc. 1 at 2.) The agents determined the individuals were citizens of another country and were not legally authorized to be in the United States. (*Id.*) The individuals informed the agents "they had escaped from a stash house through a rear window." (*Id.*) Two of the individuals "stated that while at the stash house, they were threatened by several individuals with firearms." (*Id.*) Agents noted that the "[s]ubjects were visually afraid and were hesitant to speak in detail of their experience while at the stash house." (*Id.*)

A supervisory agent asked the group "if they were willing to identify the house in which they were held." (*Id.*) "The individuals described a house near the red 'Power' sign in Sunland Park, New Mexico and near a park." (*Id.*) They told agents than an unknown person drove them "to the stash house in a black/dark SUV with chrome wheels." (*Id.*) They said there was a "Razor UTV" parked in the yard of the stash house. (*Id.*)

Agents familiar with the area drove the subjects to the neighborhood, known as "Old Anapra" in Sunland Park. (*Id.*) Once they reached the area of the "Power" sign, they saw a dark colored SUV with chrome wheels driving around. (*Id.*) The individuals identified the SUV as the one in which they were transported. (*Id.*) They also pointed out the stash house to the agents. (*Id.*) The agents saw a Razor UTV parked in the yard of the stash house. (*Id.*)

Agents saw "[s]everal subjects . . . walking around the [perimeter] of the structures located at the stash house [who] seemed to be serving as lookouts." (*Id.*) The individuals informed the agents that there were "approximately seven other immigrants currently in the stash house, to include a family group (mother and small child) from Guatemala." (*Id.*)

Later that evening, agents apprehended a second group of four people who "claimed to have escaped from the same stash house." (*Id.*) "Agents determined that the four individuals were citizens of another country with no legal authorization to be in the United States." (*Id.*)

Special Agents with Homeland Security Investigations (HSI) interviewed several immigrants from both groups. (*Id.*) Two of the immigrants, identified as Material Witnesses 1 and 2, told the HSI agents they recently crossed the United States/New Mexico border near Sunland Park with a group of approximately 30 people. (*Id.*) The group was met by "a vehicle meant for 12 occupants" and were told to get in. (*Id.*) One member of their group "was crushed and died of asphyxiation." (*Id.*) Although the driver of the vehicle said they would bring the immigrant to the hospital, they "dumped the body at an unknown gas station." (*Id.*) The group was brought to an unidentified stash house, where they stayed briefly before people with firearms came and transported the group to two different stash houses. (*Id.*)

Material Witness 1 stated "they were threatened with further imprisonment or harm if they did not pay the defendants an additional $5000 USD for smuggling fees." (*Id.*) Material Witness 1 escaped from the stash house through a rear window but "stated there were still people at the stash house who were being threatened by the individuals in charge." (*Id.* at 3.)

Lucas Gates, a Special Agent with Homeland Security Investigations, testified at the May 9, 2024 hearing. (*See* Doc. 180.) Gates testified that he was brought into the investigation after the agents had interviewed the immigrants. His supervisor, Anthony Miranda, emailed Gates a summary of the information gathered from the interviews; information related to Saul and Steven Castorena, who are associated with the 101 Calle Obregon address; and aerial images of the properties. (*See* Gov't Ex. 5.) In the summary portion of the email, the watch commander identified the addresses of the residences as 101 Calle Carrosel and 103 Calle Obregon. (*See id.* at 5.) Unbeknownst to Gates, the Calle Carrosel address was incorrect; the correct address is 101 Calle Obregon. (*See* Doc. 116 at 1.)

Gates prepared the warrant at issue. Gates testified that he relied on the information

garnered from the immigrants and the investigating agents when he drafted the warrant. Gates knew that the immigrants had identified the property, the residences, and the vehicles (the SUV and UTV) to the agents. He also relied on the aerial images, which show only two residences on the corner of Calle Carrosel and Calle Obregon, marked as 101 and 103 on the map. (*See id.* at 6.) Gates testified that he met with the immigrants and saw they were terrified. Gates was concerned about the safety of the men, women, and children who were still being held at the house against their will. Due to "the severity of the situation and [the] potential for violence to individuals [still] in the stash house[,]" (*see* Doc. 1 at 3), he did not search other records (e.g., the Department of Motor Vehicles or the County Assessor) to verify the addresses of the residences.

The amended search warrant identifies the property to be searched using the addresses 101 Calle Carrosel and 103 Calle Obregon, Sunland Park, New Mexico, 88063. (*See* Doc. 116-1 at 1.)

> The amended search warrant describes the "Property to Be Searched" as follows:
>
> 1. The SUBJECT ADDRESS consists of a single property with two separate residences that are physically joined together. The first residence is at the intersection of Calle Obregon and Calle Carrosel with an address of 101 Calle Carrosel. The second residence is located to the right of the first with an address of 103 Calle Obregon.
>
> 2. 101 Calle Carrosel, Sunland Park, NM 88063, is described as a two-story white and beige colored single-family home. . . .
>
> 3. 103 Calle Obregon, Sunland Park, NM 88063, is a single-story brown and white colored single-family home. . . .

(Gov't Ex. 1 at 2.)

From the time the immigrants identified the property to agents, the agents remained in the area and watched the residences while Gates secured the warrant. Agents then executed the

4

warrant and located Steven at 101 Calle Obregon; Saul at a structure directly behind 101 Calle Obregon, and the remaining immigrants at 103 Calle Obregon. (*See* Gov't Ex. 3.)

Gates testified that there is no door that goes directly from 101 to 103 Calle Obregon. Rather, to get from one residence to the other, one must exit the gate from a fence that surrounds the entire property, walk around the corner on a sidewalk, and enter through another gate in the same fence.

## II.   Analysis

Castorena moves to suppress on the basis that the amended search warrant contained an incorrect address. (*See* Doc. 116.) It is undisputed that the agent incorrectly recorded the address of 101 Calle Obregon as "101 Calle Carrosel." (*See* Am. Search Warrant at 1.) The Court disagrees, however, that the incorrect address invalidated the warrant.

"The Fourth Amendment requires that warrants particularly describe the place to be searched." *United States v. Dinuwelle*, No. 1:21-CR-00797-KWR, 2022 WL 2304135, at *3 (D.N.M. June 27, 2022) (citing U.S. Const. amend. IV); *see also United States v. Webster*, 809 F.3d 1158, 1164 (10th Cir. 2016). To determine whether the description is adequate, courts examine: (1) "whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and" (2) "whether there is any reasonable probability that another premise might be mistakenly searched." *United States v. Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003) (quotation marks and citations omitted); *see also United States v. Deloera-Escalera*, 636 F. App'x 977, 980 (10th Cir. 2016) (describing the "two-prong test to determine whether a warrant adequately describes the location to be searched) (quotations omitted). "Practical accuracy, not technical precision, determines whether a search warrant adequately describes the premises to be searched." *Deloera-Escalera*, 636 F. App'x at 980

(citation omitted). "A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." *Lora-Solano*, 330 F.3d at 1293 (citing *Steele v. United States*, 267 U.S. 498, 503 (1925); *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir. 1992)).

"Additionally, 'an executing officer's knowledge may be a curing factor' in a search warrant's deficient description of the premises to be searched. *Dinuwelle*, 2022 WL 2304135, at *4 (quoting *Williamson*, 1 F.3d at 1136). An officer's knowledge, however, "cannot be the sole source of information identifying the physical location of the premises." *Id.* (citing *Williamson*, 1 F.3d at 1136).

In *Dinuwelle*, for example, undercover agents performed two controlled buys of firearms and drugs from the defendant at an apartment. 2022 WL 2304135, at *1. Another agent "surveilled [the d]efendant and determined that he resided at the same apartment." *Id.* That agent obtained a search warrant of the apartment but listed the wrong apartment number, street address, and zip code. *See id.* at *1, 4. The defendant moved to suppress all evidence obtained from the search and argued that the description of the apartment in the warrant "could have applied equally to four other units where [he] lived." *Id.* at *4. The court agreed that "some of the officers executing the search warrant were familiar with" the apartment, because they were part of the earlier controlled buys. *Id.* The court found, though, that the officers' knowledge "was not the sole source of information regarding" the apartment's location, as the warrant provided the correct area (southeast Albuquerque), the correct street, and the correct apartment building. *See id.* The warrant also accurately described the exterior of the structure and the location of the apartment within. *See id.* The warrant's description was enough, together with the officers'

6

personal knowledge of the apartment, to remedy the technical inaccuracies in the address. *Id.* at *5.

Similarly, here, the Court finds the warrant was sufficiently particular to withstand constitutional scrutiny. Castorena argues that the warrant relied on the officer's knowledge of the premises to be searched and therefore lacked probable cause. (Doc. 116 at 2.) It is true that the executing officers knew where the stash house was located because individuals who had escaped from the residence pointed out the location to agents and confirmed it was the residence with a Razor UTV in the yard. As in *Dinuwelle*, "the officers' personal knowledge was not the sole source of information regarding [the premises], and" the warrant's description of the residences would have enabled "any executing officer . . . to locate the premises with reasonable effort." *See Dinuwelle*, 2022 WL 2304135, at *4.

Castorena asserts that "most of the houses in the neighborhood of the search match the description of the houses described in the warrant in that they adjoin or are extremely close to neighboring houses . . . ."[2] (Doc. 116 at 2.) Thus, he argues, "the description contained in the warrant is insufficient to locate and identify the premises." (*See id.*) The Government contends that the warrant's identification of "[t]he first residence at the intersection of Calle Obregon and Calle Carrosel" provided executing officers with a "distinctive" location as "compared to the rest of the neighborhood." (*See* Doc. 125 at 7.) The Court agrees with the Government, as there is no other residence located at this intersection. This identification is strengthened by the warrant's description of the exterior of the residences, together with a statement that the property is comprised of "two separate residences that are physically joined together." (*See id.* at 7.) The Court finds that the detail of the description in the warrant, together with the correct address of one of the two residences and the executing officers' personal knowledge of the stash house

---

[2] Notably, Castorena did not attempt to introduce evidence to support this assertion.

location, was sufficient to remedy the incorrect address listed on the warrant. *See Dinuwelle*, 2022 WL 2304135, at *5. Finally, as there is no residence with the address of 101 Calle Carrosel, "there was little probability that another [residence] might mistakenly be searched." *See id.* In sum, the amended search warrant described the two residences with sufficient particularity, and the Court denies the motion to suppress.[3]

**IT IS THEREFORE ORDERED** that Castorena's Motion to Suppress Evidence (Doc. 116) is **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[3] The Government also argues that the Court may deny the motion based on the good faith exception or because there were exigent circumstances. (Doc. 125 at 8 (citing *United States v. Leon*, 468 U.S. 897, 922 (1984); *Lora-Solano*, 330 F.3d at 1294–95).) Saul Castorena's counsel argued at the evidentiary hearing that there were no exigent circumstances. The Court disagrees, as the facts available to the agents showed that additional immigrants were still being held against their will inside the subject property. Regardless, having found that the warrant was legally sufficient, the Court need not determine whether either of these exceptions applies.